The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. God save the United States and this Honorable Court. Be seated. We want to welcome everyone to the Fourth Circuit Court of Appeals this morning. It's good to have each of you here. We have three interesting cases. Some good lawyers and, uh, in the first case is, uh, Chapman v. Oakland Living Center, Number 20-2361. Uh, Mr. Ballinger, Professor Ballinger, is it? Yes, Your Honor. Thank you. Good to have you, sir. It's great to be here. May it please the Court. I'm the Director of the Appellate Litigation Clinic at the University of Virginia School of Law, and it's my pleasure to introduce Ms. Kimberly Bechlerov and Mr. Gregory Ng, who are the students who will be arguing for Ms. Chapman today. Ms. Bechlerov will handle the opening argument and Mr. Ng, any rebuttal. We've also ceded five minutes of our opening time to counsel for the EEOC as amicus. Very good. And, uh, Ms. Bechlerov, you're first up. And your colleagues are going to, I know they're, they're going to sit back there because of this pandemic. I was going to say they need to come to the counsel table, but they're not going to argue anyway. However the right thing is, the clerk will take care of that. Can he sit there? Yes, he can sit there. Okay. Bonjours. Good to have you here. Thank you. Congratulations. This is a real great occasion for a law student, I think. Good morning, Your Honors, and may it please the Court. Kimberly Bechlerov for the appellant. The District Court's grant of summary judgment for Oakland Living Center should be reversed for at least three reasons. First, a reasonable jury could find that Oakland knew or should have known that this was likely to happen and negligently failed to prevent the harassing behavior against Ms. Chapman. Second, once her supervisor undeniably knew about the August 2018 incident, he did not take action reasonably calculated to remedy or end the harassment. Third, Ms. Chapman's resignation was an objectively reasonable response to intolerable work conditions, which constitutes constructive discharge. The child of the facility manager on at least three occasions repeatedly called Ms. Chapman the N-word. The first time this happened, in July 2018, the child attributed the hateful slurs to his father. Ms. Chapman reported the incident to Ms. Warner, the person who helped run the kitchen operations and whom Ms. Chapman viewed as her supervisor. You seek relief under Title VII in Section 1983. What would be the difference in terms of the relief that you seek under each of those authorities? Your Honor, damages might differ between the two. For instance, Ms. Chapman would be able to possibly obtain back pay under her Title VII claim and other compensatory damages under her Section 1981 claim. But in terms of the legal standard and the elements for a hostile work environment, the two are essentially indistinguishable. So the hostile work environment, you have the complaint, and you know this argument is right directly in front of you because the other side brings it up, and that is there are certain allegations or certain claims that are made there, and they seem to be pointing more so to the later events and not to the earlier ones. Do you, basically, your argument is relying upon those later events and not the earlier ones, you know, the ones I'm talking about, three years, you know, three-year gap in the earlier time then? Yes, Your Honor. The July and August 2018 incidents were certainly the proximate cause for Ms. Chapman's resignation, and that, of course, is what prompted her to ultimately resign. Those earlier incidents, though, Your Honor, we believe could either establish a continuing violation as part of a hostile work environment and harassment theory. But more importantly, Your Honor, those earlier pre-2018 incidents go to establishing Ms. Chapman's state of mind at the time in 2018 when she, again, heard those racial slurs directed at her. Those earlier incidents could also go to— Let me put a pin right there. You say state of mind, and then you mentioned continuing violation. That seems to be two different things. So which of those two are you relying upon here? Yes, Your Honor. They are two alternative theories, but— Which one do you rely upon is what I'm asking. Your Honor, we believe that a jury would use those earlier events to understand her subjective state of mind in 2018, and those earlier events also go to establishing— I said the district judge said they weren't relevant. Isn't that right? Is this really? Because they weren't raised in the PEO Secretary. That's correct, Your Honor. That is what the district court found. I think that was an error of law. Your Honor, we do believe that was legal error because those events that were not specifically named in the EEOC charge, a reasonable jury could find that they, again, were either part of— No, but the district court said they're not relevant. That means they're not admissible. So the jury wouldn't hear it. And so you got to, you're not going to convince somebody, us or him later on, the district court, that they come in under some theory of evidence. Two responses. That's what you're arguing about. Has anybody thought about Rule 404B? I—certainly, Your Honor. Those incidents, again, are relevant insofar as they affected Ms. Chapman's state of mind when she heard those words directed to her, and they go to— How would you regard, though, counsel, if you—excuse me. Tell us, do you draw a distinction in terms of state of mind with regard to the constructive discharge claim as opposed to the hostile work environment? I understand the state of mind with regard to the constructive discharge because she felt, arguably, may have felt that she had no other alternative but to leave her employment. But with regard to the hostile work environment claim, can you explain to us how state of mind plays in there? State of mind plays into the hostile work environment claim, Your Honor, because there is both a subjective and objective element to establishing such a claim. So, to your first question, though, those earlier events form the basis for both the hostile work environment claim and the constructive discharge claim. And, of course, the standard of the two claims is slightly different. For a constructive discharge claim, as the Supreme Court held in Pennsylvania State Police against Sutters, that is an objective person test. So, an objectively reasonable person in Ms. Chapman's situation would have felt that the work environment was so intolerable that she needed to quit. Now, after the second time— I just want to be clear. State of mind. How does it affect the severity of a hostile work environment? I had thought that your position more so on the earlier event would be that if it—alternative would be that it would be background evidence, not a state of mind. I don't know if it's the 4-4B that Judge King alluded to or not, but what do you mean by that? Your Honor, as the Supreme Court said in Oncology, we need to look at the cultural and contextual elements of a person who is bringing such a Title VII claim. So, here, her state of mind from those earlier incidents is relevant because it shows, first of all, how she would have taken those words that she heard in July and August of 2018, and also the reasonableness of her resignation. Because in that moment, she had very few alternatives. She complained to the person whom she viewed with apparent authority—that's Ms. Warner—but besides that, she had no other recourse. As this Court held in the en banc decision of Opal Tree against Scullin Productions in 2003, merely having an inadequate employee reporting or anti-harassment policy can establish constructive knowledge. And here, not only was there an inadequate reporting policy, it was simply nonexistent. There is no evidence from the record that Oakland Living Center— What did the district court say about constructive knowledge? Your Honor, the district court did not analyze that claim under the facts that were pleaded in. So, in essence, the district court really just went to the actual knowledge. Was it not to consider constructive knowledge here? Your Honor, we believe it was. The district court held that no reasonable jury could find Oakland Living Center responsible for the child's use of these words. But constructive knowledge can be based on several different factors here. And that was based on a theory of lack of actual knowledge, right? I believe so, Your Honor. As Judge Wynn is pointing out. But that goes back, it seems to me, there wasn't any consideration of whether it was potential 404B evidence, what happened before. Because the purpose of 404B evidence, we got all kinds of 404B opinions here, most of them in criminal cases. Because they try people for selling a couple of drugs on the corner and they prove that they sold them for 10 years before, which isn't an indictment or anything. And here, and it's for the purpose of knowledge and intent. That's right, Your Honor. That's what 404B is. That's right, Your Honor. We're not talking about state of mind of the client. We're talking about the knowledge and intent of the defendant. Your Honor, those earlier incidents are relevant not only for Ms. Chapman's state of mind, but also for notice and issues of witness credibility, as Your Honor points out. Notice, all those things. There's a list of things that can be used for. Yes, Your Honor. Otherwise, it's not a missing. That's right. It can be used. 404B, one and two. Yes, Your Honor. However, even without those pre-2018 incidents, we believe that Ms. Chapman has a triable case based solely on the July and August 2018 incidents and the woefully insufficient response from Mr. Smith. Ms. Chapman testified in her deposition that, quote, I figured it would probably sound better coming from Ms. Warner. And, of course, in this small mom-and-pop operation, they had no titles. So, her response was reasonable. Oakland Living Center failed to adequately respond to this serious workplace incident. For those reasons, we respectfully— Let me ask you a question. As long as you get questions, you stay there. Stay right there and answer. Did your client file this complaint pro se? Your Honor, she did file the complaint pro se. At some point, she had a different counsel, but these filings below were pro se. And then when there was actually an argument conducted in the district court, and she appeared pro se? Yes, Your Honor. On summary judgment posture, she was pro se. And then you and the law critic, the UVA, got into it on appeal? That's correct, Your Honor. Very good. Thank you. I wanted to understand that. Thank you very much. Let's see. Number two is the EEOC. Mr. Horowitz. Mikas. Good to have you here, sir. Thank you, Your Honor. It's good to be here. Excuse me. And I apologize for... There we go. You all right? It's good to be back in person, Your Honor. Good morning, Your Honors, and may it please the Court. I'm Jeremy Horowitz with the EEOC. To begin with, I'd like to pick up on the point Your Honors were exploring with counsel regarding constructive knowledge. Um, a reasonable jury could find on this record that the employer, Oakland, had constructive knowledge of the harassment as of July. Let me be clear. As I understand it, the district court only made an actual knowledge determination. That's correct, Your Honor. They did not look at constructive knowledge. So to the extent that you're about to tell us what could be the basis, isn't that the job of the district court to go back and look at the record and determine whether there is a constructive knowledge basis? It absolutely is, Your Honor, and district court didn't do that. But isn't that sufficient for your argument? I mean, if, in fact, it is necessary, you don't need to tell us because we're not going to go through the record and comb through it to see if there is sufficient for constructive knowledge. I mean, sometimes we do, but that's district court stuff to go back and make findings of fact. In this instance, the district court didn't even look at the constructive knowledge. Is it required for the district court to do so is the question? I believe it is required in this case, Your Honor. Well, the district court could have found actual knowledge as well and a negligent response to the actual knowledge. But to the extent the district court is doing a full analysis of the negligence issue, it does need to look at constructive knowledge. We would only point out that to the extent the district court does need to look at constructive knowledge, it should look at the lack of a reasonable complaint procedure, not just the lack of a formal complaint procedure. And there was no formal complaint procedure here. Eric, with us, if you can, if you will, the difference between the theory of continuing violation and state of mind, what I would call background. I mean, would you term it as a state of mind or as a background evidence determination in the alternative to continuing violation? So, Your Honor, we didn't take any position on whether there was a continuing violation here. But in terms of the background evidence and its use in this. We got that down. You mean you have no opinion on the continuing evidence? No, no opinion on continuing violation, but it could be used. What are your thoughts on a continuing violation that this constituted a continuing violation? Your Honor, I'm not authorized to opine on that. That wasn't part of our argument. But I can say that. That's an interesting argument. I don't know if you, when you come before us, we don't have you come up here and tell us what you're not authorized to talk about. You either tell us or you don't tell us. That's insulting, to be honest with you. I apologize. We can't answer your question because we haven't taken a position on it. Then that's not helpful to the court. I apologize, Your Honor. And I certainly did not mean to insult the court in any way. You tell us in the brief that maybe I've overread that, that you won't talk about things we want to talk about. We simply didn't take a position on that in the brief, Your Honor. You're taking a position now. You're taking a position. You don't want to talk about it. You're taking a position in support of the plaintiff. Yes, Your Honor. The EEOC is here to support the plaintiff. Yes, Your Honor. I don't know why you don't have to answer the question that Judge Randy Cuddery. Well, move on. It's an interesting point to me because, first, you did not even check that continuing violation box where we got the Chaco case to deal with. You ought to have an opinion on that. And then secondly, even if we do venture into this, the question is, you know, it's an interesting case. You got a three-year gap here. And does that exist in this case? Seems to me that's more, that's stronger than seeing background evidence when you're able to tie it in with the actual charge. That gives you a very strong case. Then without that, then you're left with nothing but these events that have occurred, you know, post-2018. And which one are you on? Are you in a hostile work environment? We're here for both the hostile work environment, negligence— What are you addressing? Severity or imputability? Both, Your Honor. And which one do you think is established in this case? Your Honor, both. Both have been established here. There is both severity and imputability. Severity to the extent that, as this Court held in Spriggs, the words that were used, the slurs that were used, are, quote, pure anathema to African-Americans. And in addition, in terms of the hostile environment, a jury could find that the addition— The Spriggs case was a 1981 case, wasn't it? It was, Your Honor, but the— Well, it was both. It was 1981 and Title VII, but the Court indicated that same analysis applies to both. Um, but in— You know, dealing with the severity, and I want to be clear on this, it looks to me the cases that have dealt with that, those statements were made by a supervisor, right? Uh— In previous cases. Some have been, some have been co-workers. Some have been third parties, Your Honor. And have any been a child? I'm sorry? Any been a child? Six-year-old child? Oh, a child. I'm sorry, Your Honor. Spriggs was the boss. Uh, correct. Not owned the place. Your Honor, but looking at who the child was in this case is relevant in considering the totality of the circumstances. You have the child who is the grandson of the owners, the son of the supervisor, and has attributed these comments to the supervisor himself. Is the whole case relying upon what the child said? It is, Your Honor. I mean, that's our— Doesn't that make it really difficult? I'm just dealing— When you think about it in the EEOC, six-year-old child comes in, used racial epithets and the whole bit. Mama said this and the whole bit. Uh, father brings the child in, says he spanked the child, asked the child to apologize. Child refuses. He's six years old. Something happens, the father leaves, and that's been the big deal. The father left, and he didn't apologize himself. That much is clear in the record. But is there any other case like this? This is troubling from the perspective that this child is doing this, but it is the question then become, is how do we impute what the six-year-old child is doing to the parent or to the supervisor or to the owner of whom that was said? Your Honor, the employer is liable for negligence in terms of the work environment. Now, the child said this. It's true. Initially, he says the word. He gets spanked. Well, he said his father said it, didn't he? Oh, I'm sorry. I was talking about the August. Yes. In July, he says his father said it. The child said what he said. He said, this my father said. Yes. That's what happened in July. You're the n-word or something. He attributed it to his father. Yes, Your Honor. That's what happened in July. That's correct. OK. So in terms of constructive knowledge at that point, a reasonable person wouldn't know, or a jury certainly could find that a reasonable person wouldn't know whom to complain to. Can't complain to the supervisor because he is the one who allegedly made these comments. Can't complain to the owners because of these previous racial incidents. And that's where the background evidence comes into play in terms of this negligence. Well, tries to complain to Ms. Warner, but apparently, at least according to the record, there's no indication Ms. Warner passed on that complaint to anybody else. Can't look for recourse to any sort of formal policy because there is none in the record. And it's undisputed that no formal policy was communicated to the employees. So a jury could find that a reasonable person in that position would not have any means of lodging a complaint about the harassment. And as this court held on Bonk and Oakletree, that means that constructive knowledge may be attributed to them. And they didn't respond in that at that time. Then turning, Your Honors, to the second incident, which Your Honors had brought up, yes, the supervisor thanked the child and told him to apologize. But he didn't accompany the child to make sure that the child did apologize and didn't apologize himself. And he wasn't there to supervise the child, who at this point was crying and was then able to, in this very upset state, again repeated the slur. A reasonable jury could find that particularly given the severity of the slur at issue, that wasn't a reasonable response. And as this court held in prior, even though repeat of conduct isn't determinative of the issue of unreasonableness, it certainly can be considered when determining whether the response was reasonable. Thank you. We gave you some extra time, but you've got a lot of questions. Thank you very much, Your Honor. We appreciate your assistance. Mr. Yarbrough, good to have you with us, Mr. Yarbrough. Thank you, Your Honor. Good morning, may it please the court. My name's Jonathan Yarbrough. I'm representing Oakland Living Center in this particular matter. I forget which of you asked the question about representation. I think it was you, Judge King. It's been an interesting case in that the plaintiff proceeded pro se, then she did have representation that's noted in the record, then filed her lawsuit pro se, then filed an amended complaint with counsel who, after discovery, withdrew from the case. And then at the hearing in front of Judge Reitinger, she was again pro se. And then, of course, now she's represented by the University of Virginia. But she started it herself, pro se. The initial. So she had two lawyers along the way at different times. And at the time of the argument on the merits, she was pro se and she appeared. That is correct, Your Honor, at the time. She argued on her own behalf. Yes, sir. She was pro se. You were there during all these proceedings. Two and a half hours of it, yes, sir. Yes, sir. And then, so at the time of Judge Reitinger's opinion, she was pro se. That is correct, Your Honor. And she lost. And then the UVA got into it. That's absolutely correct, Your Honor. Does she get any benefit of a liberal construction situation, whatever the law is on the way we get to pro se litigants? Well, I think that's. This is a civil proceeding. Usually we have that coming up in criminal cases. I think that's an interesting question, Your Honor, given the fact that she's been represented on again and off again. And. I don't know where the off and on and off again is and where that has anything to do with it. She was pro se when she filed it and then she was pro se when it was argued and she was pro se when it was disposed of. That's correct, yes. Yes. I would suggest that she would get some benefit. I know we've raised the question before the court about her waiving arguments at the trial court level. And we've briefed that. Of course, the University of Virginia has taken a different approach with that. I doubt if we apply a lot of waiver things to a pro se litigant. No. And our arguments take the position that even if this court is not going to apply a waiver, we still think that we prevail and that Judge Ridinger's decision should. Well, I understand that for sure. If that's your position. But that's the kind of thing that the status of being pro se when that comes into play, when you're talking about waiver and whether they've complied with all the court rules and all that stuff. I'm sorry. They get some leeway. Pro se litigants get leeway. They get some leeway. In the federal court system. They do. They do get some leeway. Things have to be read in their favor, liberally, whatever. Whatever it says. There's cases like that. Well, and sure, they do get some favor in the federal court system. But we would argue even attaching that favor to these particular facts, the order and the judgment below should be affirmed. I mean, this is a case. Well, I understand that. You're sticking with that. And you definitely can stick with that. Yes, sir. For sure. Yes, sir. The way we look at this case is there's no continuing violation in the events from really... Well, there's no continuing violation. It looked to me like there was evidence that this stuff started in 2009 when they told her they were going to take her picture and going to give her a slave number. Well... And then wrote slave number on her badge. Well... Slave number. Those are her allegations, Your Honor. Well, we don't... Isn't that true for purposes of this appeal? Yes, sir. For purposes of this appeal. That's true. We take that as true. Now, you can say it's not admissible. It's not proper for consideration, but we have to take it as true. Absolutely. So it started in 2009 with that. And that's a pretty striking piece of evidence if it's admissible. If it's admissible, absolutely. Yeah, if it's admissible. And you're talking about continuing violation. Well, if you read it in light most favorable of her, then why wouldn't it come in? Well, I don't think that even reading it in the light... Why wouldn't it come in under 404B to prove knowledge and intent? Well... Notice. And they knew all this stuff. Sure. Getting back to your... They started it themselves in 2009. Well, getting back to your original point, Your Honor, about the badge. Sure, we have to accept that fact. It's true for this purpose. But when we're looking at whether or not this information comes in, we're looking at a purported badge that was really nearly a decade prior to the other events at issue in this particular case. If we're going to go back and allow that in through a continuing violation theory or otherwise, we're basically emasculating the statute of limitations for either the 1981 claim... The continuing stuff gets you past statute of limitations issues. And the question is whether it comes in under 404B. And we got people doing years and years in the penitentiary who complained about evidence that was a long time ago and evidence that wasn't charged and evidence that wasn't in the... Allegations that weren't in the indictment. But they come in as evidence at the trial under a theory of what I keep talking about, 404B. Because we have said that's a rule of inclusion, not a rule of exclusion in the criminal context anyway. And I don't know how it would make any difference here. And people get convicted of dastardly crimes and do long sentences. They may have been a lot better off if they could get that kind of stuff out. They couldn't keep it out because we got law that permits the prosecutors to put it all in. I understand that, Your Honor. Why wouldn't that kind of a rule apply on this kind of a case? Well, in this circumstance, we're looking at different factors. The purported badge incident involved Arlene Smith. It was not worn past 2011 per Ms. Chapman's own testimony. She worked there for another four or so years after the last badge incident. The cake incident, Your Honor, was Beth Smith and Steve Smith, at least according to Ms. Chapman. Steve at the time worked with a pool company. He had a pool, a swimming pool company. Beth was not an employee. And then we skip three years, in fact. She voluntarily left the facility, left her employment there. It comes back three years later and with no objections, no concerns whatsoever, and then works until the July event with the child, J.C., and then the August event with J.C. What we're looking at here, as far as we're concerned, is different actors, different time frames, different events, a major gap of three years where she voluntarily left her employment. I know that the EEOC and the University of Virginia are trying to kind of wrap everybody together like they're one crime family, but they're not. So we don't believe that comes in. It is the same family and it is the same kind of conduct. Well, that's one of the issues you certainly will have with small businesses that are family-run. In this particular case, you had Arlene, who is the licensed administrator and the nurse. You had Mike, who... You know what makes this case interesting is that it's a family event. They've got four boys who, at least from the allegations, they basically live in this facility. And it's one thing to have conduct by children that is offensive, whether racially or whatever, or sexually, within the home place, away from other people. But when you know your children are in the vicinity of other workers and can be offensive, and then you have some indication of it, and this goes all into the environment, the work environment, the harassment aspect of it, which that allegation is made. The question is, what do we consider? Do we consider pre- or post-2018 conduct? And an issue that I think is really important, the trial court went to the four elements, four prongs of the harassment, went to the imputability. Said, okay, that's not here. You argue severity, of course, is not there. So that's the force, too, is whether those two things are met. When you're looking at the imputability, the question then first is, do you have knowledge? The trial court went directly to the actual knowledge. If you look at the pre-2018, looks like me, that's pretty clear. If you don't look at it, then it's kind of a close call on that second part about it. But then the case law seems very clear that you can establish it with constructive knowledge. And the trial court didn't touch it. Doesn't that require us to send it back to the trial court to look at it from the perspective of constructive knowledge? I would beg to differ with you, Judge Wynn, on that issue when I look at the footnote that Judge Reitinger dropped about the knowledge. Well, let me just flip the question where you're different. Are you saying the trial judge, in fact, did consider constructive knowledge? I don't know that the trial judge used those words, constructive knowledge, but the trial judge did address the status of Ms. Warner. He dropped a very lengthy footnote about that. And in fact, I have it here in front of you, in front of me, Your Honor. It says, this is on page 10 of the judge's order. He says, in her charge filed with the EEOC, the plaintiff asserted that she did not report this incident. In her deposition, plaintiff said she told her co-worker, Patricia Warner, what had occurred. The plaintiff's related assertion that she told Warner about the July incident does not suffice for evidence of notice to a supervisor. The plaintiff and Warner both worked as cooks. The plaintiff admitted in her deposition that Warner was not her supervisor in the term, as the term is defined in discrimination claims. And therefore, she did not report the incident. The court says, therefore, the evidence before the court establishes that she did not report the July incident to anyone in authority so as to put OLC on notice. I would submit that that addresses both the actual and the constructive piece, because she purportedly told— Does it address it in a summer judgment? And does it address it in a light most favorable to her? Or viewing the evidence, you know, from her point of view, does it do that? Yes, sir. Is it required to do that? It is required to do that, and it does do that. When you look at— But she said that she thought that Warner was her supervisor, considered her her supervisor. Well, but when you look at that further, Your Honor, and dig down to what she actually testified to, she said, well, she gave me instructions. The instructions that she actually gave her— You have to review and said you look at that in a light most favorable to her, not the testimony in a light most favorable to you, which was that she admitted, you said, and it says in this footnote that she admitted her deposition was not her supervisor, as the term is defined in discrimination claims. Yes, sir. Maybe she admitted that. But she said she thought she considered Warner to be her supervisor. Isn't that right? So you view it, if there's two views of it, there we are, at least two views, we've got defined here. She gets the benefit of the one that's most favorable to her. That's what this stuff about being, looking at it in a light most favorable to her is all about. And the only question we have here, what this is all about is, is this a case that can go to the jury? Or is it a case that a judge can decide on summary judgment? That's what the issue is on appeal. Yes, sir. Does this lady entitled to a jury trial? Well— And what would it involve if she's entitled to a jury trial? And either way, the case is going to get resolved. But is it a jury case? And if it is a jury case, under our system of justice, she's entitled to a trial by jury. Not to have her case thrown out and gone with no jury. Yes, sir. I understand that. But I would take the position that what she thought needs to be viewed in light of what she also testified to. And she testified that— Well, they're contrary to one another. If you read them and consider them, they're two different versions. Well— And there's two different things. She thought Warner was her supervisor. Under the law, you say she admitted Warner maybe wasn't— that Warner wasn't her supervisor. Okay. But she thought Warner was her supervisor and she reported to Warner. Doesn't she get the benefit of that view? No, Your Honor, in that particular circumstance. She's taking contradictory positions here. So you can stew it against her. So you've got— you can stew it against her. Well— By your version of it. You can't overcome a motion for summary judgment by taking two different positions. And that's what she's done here. You can overcome a motion for summary judgment by requiring the facts to be viewed in the light most favorable to the non-moving part. Yes, sir. But to analogize it to present-day politics at the risk of ticking off people, there are many people who believe President Trump's still president. He's not. The facts are otherwise. In this particular case, she testified that what— Far-fetched example. That doesn't lead to what's going on here. You spoke to reporting. Reporting goes to actual knowledge. Yes, sir. So we're talking about construction, constructive knowledge. That would be whether there's any policy or procedures in place there. And there's no— I mean, we don't know that to Judge King's point. We're not being argumentative. We're simply saying, if it gets into a disputed fact area, we send it back to the trial court and says, that's your job. You determine whether this is there or not. You, in fact, make a pretty strong argument. But, you know, when you come to our court, we don't make that call. And that's all we're saying here, is that the trial court— you say the trial court did look at constructive knowledge, but you pointed to the reporting. And reporting is actual knowledge. You didn't point to anything there where the trial court ventured into constructive knowledge. And I venture to say, it doesn't appear to me he looked at it at all. He didn't have to if he found actual knowledge. I would think, if there was direct evidence. But if there is this evidence, you can find it otherwise in an instance of this, then I think the trial court should have made a determination or looked at constructive knowledge. I think it begs the question, Your Honor, of constructive knowledge of what? Which particular event at issue? If we're setting aside the nearly decade-old events, we have the July reported argument where J.C. allegedly said, my daddy says you are. Why do you get to set aside the decade-old events? Why do you get to set those aside? Well, we would argue that... I know you argued and you took that against her. You said it wasn't admissible. It wasn't complained of in the OSC complaint or not the OSC complaint, the EEOC complaint. But that's when it started with the slavery badge. That's when it started. And she worked nearly a decade thereafter without any complaint. She returned without any complaint, any concerns with this particular business and this family. It's time-barred from the EEOC standpoint. It's time-barred from her statutory claim. We don't believe it's admissible. It's too remote in time. It is time-barred if it did not meet the continued violation to make it a charge. Yes, sir. Beyond that, as King has alluded to 404B, I call it kind of background evidence, it would be admissible to pre-incident for the purposes of providing background information to show you the environment. Now, of all the things here, this business is that cake. Wasn't there a cake where there was a... given to her some years ago where... What was the noose about in it? Around... She contends, Your Honor, that it was a birthday cake for some monkey-themed birthday party for the twins at the facility. What did the cake depict? It's what it was. That was the... Well, I would contend it's the twins holding her hands. Tell me what it is in the light most favorable to the non-moving part. What did it contend? Well, she contends it's the two twins beside her with a noose around her neck, a cake that she... Depicting a black figure. It was hanging from a noose. It was black icing. And told her to leave so the children could enjoy the party in February 2014. Those are her allegations. She also alleged that she... Isn't that taken in the light most favorable to her? But you say it's not relevant because it's too long ago. Too long ago. Too long ago. But that's classic continuing incident evidence and that's classic 404B evidence to prove pattern and notice and conduct. Your Honor, our position is too long ago. It's given to her by Beth Smith, who's not an employee of the facility. At the time, her husband, Steve Smith, had the pool business. That's in the record. He was cleaning pools. He would occasionally do work at the facility. It was only in the second stint of employment that Steve Smith became supervisory per se. It's in the record that he was studying at that point for licensure. You have to have a license to be an administrator. So the position we would take is Arlene was obviously the administrator of the cake issue. You're going to have to lump this whole family together as some sort of racist family to tie these pieces together. I'm not saying the lump. I wouldn't want to call any family racist per se. I agree with that. But you do have the individual incidents that all point to the same thing by different family members, even down to the six-year-old who then says, if my father says this, there's something going on here amiss with this kind of evidence. And it may be the time is a saving factor here from Oakland's perspective. But nonetheless, something is here. It's not just a lumping. It's not an unfair thing to say there's something going on that's amiss in his family. Now, that's not totally out of record. We could go into the facts of it, and let's not do that. But the lump thing, you always make it sound like it's unfair to them. I don't think so. No, sir. I don't mean to come across as it being unfair. I think we're talking about discrete incidents with discrete individuals who are not family members. We're talking about a situation where we're trying to tie in events, purportedly said by JC, who was not even born at the time of the cake incident, to loop all of this together to get some sort of continuing violation or to pull it within the statute of limitations. We would argue it's time barred. It's not relevant. And then when you look at the actual July situation, she told a co-worker. And it's clear in the record she's a co-worker, despite what she contradicted herself with her own testimony, because the direction and control that was given to her was Mike would change the recipe. In fact, the testimony is he would say, we're serving Sloppy Joes and communicate that to Weaver, who in turn would tell Ms. Chapman. Or don't serve quiche is the other example, because no one likes to eat quiche. That is not sufficient to create a supervisor, notwithstanding what Ms. Chapman thinks in this situation. So no one knew about the July incident. You look at the two August incidents, no witnesses to these at all. No one knew. She told no one. When she finally told Warner about the first August incident, we would contend that Steve Smith took action. He took action. He whipped that boy. In fact, the testimony is he was wailing. Excuse me, though, Mr. Yarbrough, and I don't mean to interrupt you, but if I could just focus you on that. Let's just say we agree with you that these past incidents are not relevant to the hospital work environment because of the interruption of employment. Okay? And certainly, let's say that we agree with you that Warner was not a supervisor. She was a coworker. So we're not going to get into that. Why isn't the actions of the father, why aren't the actions of the father in August? Why don't they create a question of fact for a jury in terms of the father's conduct? The father didn't, and this was a horrific insult that his child leveled at one of the employees. He knew the child was uncontrollable because the child refused to apologize, and yet he left the child there in her presence knowing that this could well occur again, and he didn't apologize to the employee either. Why doesn't that create an issue of fact for the jury, leaving all the other stuff aside? The law is we don't have to be perfect. We don't have to actually take action that completely negates the possibility of this ever happening again. It's that we have to take reasonable action, and we would submit that the action taken was reasonable. I don't use corporal punishment on my children and didn't, but I sure remember getting my share of it as a kid, and I think from Steve Smith's viewpoint, he thought that would take care of it. Then you couple it with the fact, Your Honor, that he's the only person in management there at the time, so he left to deal with an issue. We don't know what it is. Without saying a word to the employee who was the subject of this racial slur, why, I guess what I'm stumbling with, and I'd like your help on this, why doesn't this go to the jury on that question? I mean, and let them decide. Why would we decide as a matter of law that the father took appropriate action? If I may just add a couple of facts to your question, Your Honor. The testimony also is that as soon as he was there, he saw Ms. Chapman leaving. He called out to her. She ignored him. Then they called again twice. She ignored those phone calls. So there was no way to address or remedy it beyond then. So the actions here are certainly reasonable, and Judge Ridinger concluded that it was reasonably designed and reasonable effort to— It's a jury question. Well, in this particular case, Judge Ridinger decided it. We believe that is correct. I think it— The problem is Judge Ridinger is not the jury. I'm sorry, Your Honor? The problem is he's not the jury. And the question here is you got the remedial actions been taken. He didn't apologize. And you've got a six-year-old child you're unresponsible for. You typically, when you confront another adult, first thing you say, I am sorry for the actions of my child. You don't just have the child— When the child refuses, you know, you then go away for whatever reason and just leave that child there to then spew some more racist abuse upon this person. That's the problem here. And not saying it can't go either way. The question is, is that a judge question or is it a jury question? And the jury is— Could a reasonable jury find that it was reasonably calculated to stop the harassment, the action that was taken here, that he did not undertake any opportunity to apologize himself for the actions of his child? He lives there. Child is basically in this environment. He goes away and leaves this child there with him to continue on with what he's doing. I would submit to you, Your Honor, that's a question for the court. The judge decided appropriately. Steve took action. In fact, the testimony is— That's all conclusion. I think you're right. I like that right of opinions where you say, I submit to you, the judge decided appropriately. That is a wonderful conclusion, but what is the basis for it? The basis being what? In other words, you are saying, I submit to you, Your Honor, he did not— that it was not— that the question of whether he himself apologized is not something a jury would think he should have done, and I submit to you that he can walk away and let the child stay there, and no jury would find that that was sufficient to show that he did not do something reasonably calculated to stop the harassment. Well— It's not our question. It's not Judge Wright's question. The question is if a jury looks at it. Jury could go one way or the other, couldn't they? I don't think so, Your Honor, because when you look at Judge Ridinger's decision and what we argued, what happened is the child was spanked so roughly or loudly that you could hear the child wailing. He came in. He's bawling. He's holding Warner's legs. It had no effect on that kid. He turned right around and did the very same thing again. What good was that spanking? If we're taking the facts in the light most favorable to Ms. Chapman, yes, there were obviously no witnesses present. You would be having a lot better argument if you had a bench trial. I mean, if you all just waived the jury, had a bench trial, presented the evidence, the judge can make findings of facts. But in a summary judgment proceeding, you've got to give her the facts if they're disputed. Yes, sir. Look at it in the light most favorable to her. That's what the law is. And I would agree with you on that point, and I think the court below absolutely did that. And I see my time is up, I believe, but I would recommend . . . Do you have anything . . . You're giving me some extra time. And that's . . . We gave them some extra time, too. And I'm going to cut you off if Judge Wynn and Judge Keenan have further questions. I appreciate and welcome any questions you might have. This is an interesting case, and I believe Judge Wynn asked the question of what does a trial in this particular case look like. I think it looks very interesting. The dynamic of having to put a now eight-year-old boy on the stand. Let's talk about memories from several years ago. It would be an interesting trial, Your Honor, but we don't think it gets there. There's no continuing violation. There's no actual knowledge. After Steve did what he thought was best in the circumstances, he left to tend to business. When he saw her walking out, he called for her. Beth Smith called for her. She never told them anything about the second incident in August. She didn't give them the opportunity to address it, and I think . . . I assume at a trial, you probably would just accept that the child would say those things. It would probably be the father on the stand. I'm so sorry. I would think at a trial, you wouldn't need to put the child up there. You would just say, yeah, the child said these things. And, you know, because it's not a dispute as to whether the child did it. It's really what the father did. So I'm not sure that trial would have . . . I'm not trying to case. I'm just trying to think. I was in your shoes. I would probably wouldn't have that child up there. I probably said, well, we would stipulate what that child said. Well, I don't want to get too far outside of the record, but I will answer your question. I think it's frankly an issue that I've been debating for some time if this does go back, and obviously there are a whole lot of facts. It's been decades since I've been in a courtroom practicing on your side, but I tend to think about that every now and then. Oh, yes, sir. I've thought about how to address this since I first got this case. So it's an interesting case, interesting issues, and I appreciate your time. I will certainly entertain any further questions you might have, but I would employ this court to affirm the judgment below. We very much appreciate your argument, and very much so. Mr. Ng, is it ready to make a rebuttal? On behalf of Ms. Chapman. Yes, Your Honor. You're a third year student at the law school at Charlottesville. Yes, Your Honor. Good to have you here. It's an honor to be here. I'm happy to be here. Just a few things, Your Honor. First, there are at least three grounds for imputation of liability to Oakland here. First, actual knowledge by inference from all of the evidence supplied by Ms. Chapman. Second, constructive knowledge that Smith's and then third, the fact that Smith's response to the incident in August was woefully inadequate. For these reasons, the issue should be before a jury and we ask for a full remand for trial. Moving to the constructive knowledge point, it's not necessary for our case to show that Ms. Warner was strictly a supervisor. Rather, knowledge can be imputed just from the clear absence of a reporting structure present in this case. Well, we've been down this path a little bit, both counsel and the question is, did the trial judge actually reach the constructive knowledge from this? I do not believe so, Your Honor. You heard the response of the opposing counsel. You talked about the reporting and how to respond to that. Your Honor, I don't think that the district court's response to that considered several of the arguments we make. I don't think that, and in the alternate, I believe that if you do believe that they did reach a constructive knowledge argument, I believe that it was legal error not to put this before a jury. I think when looking at this case, it's important to consider the complete dearth of any kind of reporting guidelines. Ms. Chapman was clear in her deposition that she was completely unaware of any kind of employee handbook. Her supervisor, Mr. Smith, had testified in his deposition that he'd never read the thing, and Arlene Smith, the proprietor, despite reviewing the employee handbook the day before her deposition, couldn't recall a day later any kind of reporting guidelines. Under this situation, if there was genuine confusion on Ms. Chapman's part about who to report to, the responsibility and consequences for that should lie with OLC's failure to promulgate clear guidelines. Unless there are any questions on that point, I'd like to move on to address why Mr. Smith's response to the August incident was unreasonable. I think there's been some discussion today about the reasonableness of Mr. Smith's response, and I think it's important to remember here the legal standard, that the action taken in his duty as a supervisor must be reasonably calculated to end the harassment and restore the workplace environment. As a supervisor, this response to repair the relationship should begin with Ms. Chapman. However, his response was dehumanizing, and it essentially ignored her. He addressed this incident not as a supervisor, as he was legally bound to do, but he poorly addressed it as a parent, focusing all of his attention on the child. But I don't want to get into that at all. But he said it was a pretty good spanking. You could hear it. So he didn't completely ignore her. Your Honor, even if he was able to essentially beat a coerced apology out of his child, we believe that that would be inadequate. But that's not what happened. Instead of actually getting an apology, he simply returned the harasser to the workplace, and he left Ms. Chapman the victim of racial harassment, alone in a room, unsupervised with her harasser. And what happened? More harassment followed. And if you turn to— It seems to me that your argument, you know, when you talk about the six-year-old child, if you were talking about the next door neighbor or something, and he was working out in the yard or something like that, it's kind of an open area. But in a workplace where basically, at least the allegations have been made, this child essentially lives there, you can't escape them. So is there a heightened duty on the part of parents who bring their children to live in an environment, and once they kind of know the source, in this instance, he did know about it, and then he walked away from it? The question then is, maybe it is a jury question, is, you know, is that a situation that's different? You have to be very careful. You don't want to make parents liable for things a child does, you know, to someone else. But in this context, where it's the employer and who's the immediate supervisor, whomever there, it's their child who lives there, and this is the employee where you've got these prior things, those background things, the question then is, you know, what is the significance of that? I mean, it seems like to me, you need to cabin this case in a narrow vein in order to be able to prevail in that light. You don't want to make this case too broad. Correct? Your Honor, may I reply? Of course. I'm out of time. Of course. Thank you. You're already here. I believe that there are two different questions we need to look at here. First, in his duty as a parent, the significance of the child being constantly in the workplace, it's important for, first, the failure to prophylactically stop this kind of racism from occurring. We have argued that there was, that the parents were on at least inquiry notice that their child was liable to repeat these kind of hateful attitudes in the workplace. And by introducing him into the workplace, that was a risk that OLC assumed that he might repeat this kind of language around coworkers, and that would make them liable for a hostile workplace environment. Second, I think it's important to note that in terms of taking remedial action reasonably calculated to end the harassment and restore the workplace environment, after this incident, the child remained in the workplace. The child had harassed Ms. Chapman and then when asked to apologize, harassed her again, and the child showed up presumably the next day and presumably continued to spend time in that workplace. Case law in the Fourth Circuit, EEOC, Egregious Injury Wholesalers, shows that progressive steps are required at a bare minimum if the initial thrust at stopping, at taking remedial action has failed. And I believe in this sense, Mr. Smith has completely abdicated his responsibility. Thank you, Mr. Ng. And we appreciate all the work of counsel today. And if it wasn't for the pandemic circumstances, we'd come down and shake hands with each other. As we, as the Fourth Circuit has done for years, but we're not going to do that today. We're not doing it this week, unfortunately. But we thank you for your help and it's really good to have you here. And we're pleased to be back in Richmond. And with that, Madam Clerk, we will take this case under advisement and we'll arrange to go to the next case.
judges: Robert B. King, James Andrew Wynn, Barbara Milano Keenan